We have five cases on the calendar this morning, four of them patent cases, two from the district courts and two from the PTO, and a government employee case from the Merit Systems Protection Board that is being submitted on the briefs and will not be argued. The first case is Jericho Systems v. Axiomatics, 2015-16-56. Mr. Fee. Thank you, Your Honor. May it please the Court, I'm Kevin Fee here on behalf of Jericho Systems Corporation. The first sentence of the summary of the 836 patent makes clear that the invention is directed to a system to maintain and establish security access policies that substantially eliminated many of the problems in the prior art computer-based security access control systems. Well, the first sentence might be fine, but why don't we just look at the language of the claims? Sure. And don't the claims just outline mental steps with a computer added? No, Your Honor, I don't think that they are just adding a generic computer to mental steps. The claims themselves, as you know, go through a very detailed series of steps that provide an improvement over the prior art computer-based access control systems. So this isn't an example where you're dealing with somebody saying for the first time, you know, it would be great if we implemented security policies on a computer, and you should just use a computer to do this abstract idea. What we have here is we are dealing with problems in prior art computer-based security access systems, and there are specific concrete problems that need to be resolved related to those systems. What are the problems that, once you pass the point of saying, okay, we're going to have an attribute-based access system, once you make that decision, what are the problems in the field that this claim solves? Sure. There are several problems there, Your Honor, one of which had to do with trying to resolve issues related to bandwidth and processing power. So what the system does is instead of going out and either accepting all the attributes along with the request, or once you're receiving a request, make a search for all the attributes that are required to answer the rule, it first checks the server to make sure that whether or not it has the attribute available at the server already. So it doesn't need to go out and make queries that are unnecessary when the information is already present at the server. The information could be present at the server in the standard case. I thought you were going to tell me that the innovation here is that it essentially outsources some of the attributes through the connectors to some of the other databases. Well, what it does is it sets up a system that minimizes the connector requests that are necessary to be made by first making sure that it needs to make that request. So there are two different places that the attributes can be stored. One would be at the server and another would be out in one of the databases out in the field, so to speak. So you have a system that uses both of those. Is that the invention here? Well, it's not the invention, Your Honor. I mean, that's one of the ways that this system went about solving problems related to bandwidth and processing power. The invention, obviously, is the entire series of steps that provide other benefits. What's innovative here? Well, I think it's the combination of all the steps here, Your Honor, that changed the way that computer-based access control systems work. It involves, among other things, separating the server from the user so that there's no way for the user to corrupt anything that's done at the server and there's a policy enforcement point that's in between the two. It develops a system that doesn't require you to use as much bandwidth because it first checks to see if it has the information available at the server. It does. We had a list, I think, of five things in our brief that we identified that were improvements. Just give me one second here. Okay, so it also structured a system by which the user could not directly access the rule to determine whether or not access should be granted, I think. Well, accessing the rule is one thing. There's also retrieving the rule that's specific to a user request. So instead of having all the rules present at the server, it goes out and retrieves the specific rule once it knows what is being requested to be done. And the benefit of that, among other things, is it makes sure that we're not using stale rules. Isn't that inherent in an attribute-based access system? No, not necessarily, Your Honor. You could have an attribute-based access system that maintains the rules at the server. Well, I thought you told me that you might well have the rules in your system at the server. I'm sorry. I think there's a little bit of confusion what I was talking about earlier then. I was talking about whether or not the attributes, user attributes, were present at the server. User attributes as opposed to the rules. Right. I see. Okay. So those are two different things, of course. And it's important that both of those be queried, if necessary, in real time so you make sure that you're not using stale information. Counselor, I was surprised at your initial answer, your first answer to Mr. Bryson's question, was this notion of preserving bandwidth. Is this an argument you've made before? Oh, yeah, Your Honor. I mean I could be happy to point to you in a voice. But is that really one of the goals of the patent? Yeah, I think that there were several goals to the patent that all related to solving the problems with the prior computer-based systems. One of which was reducing the processing power and reducing the bandwidth that were required for the system. Another one was making sure that there was improved security measures, such as preventing the user from having access to the rules that were required by the server to make any access decisions. You're saying that you preserved bandwidth by virtue of the various steps of the claim. Yes, that's right, Your Honor. In particular, what we've described as claim one step, I think it's E1. It requires for each portion of the plurality of attributes, determining whether an attribute value for the attribute is present at the server. And like I explained before, that prevents you from making unnecessary queries. That's still a mental step, isn't it? Still a mental step. It's still an abstract idea. Well, it's not a mental step. You have to check the server to see whether or not you have information present at the server. I don't see how that's a mental step, Your Honor. That's checking a physical server to determine what information is available there. So I do want to talk briefly about a couple of things. How much different is that from looking into a filing cabinet to see if the information is there? Well, I mean, that's different from a filing cabinet in many ways because there's no issue with respect to processing power or bandwidth that you have to worry about when you're dealing with filing cabinets. So I think that's the primary difference. There are concerns at issue that aren't really present when you're doing a search of a filing cabinet. So the only difference is that you're using a computer under the pen? No, Your Honor. I mean, first of all, I'm just focusing on the one specific element you were talking about there. But the difference between looking in a filing cabinet for, I guess, examining whether or not an attribute value is present would be several things. First of all, the user in that circumstance would have access to the information that was used to decide whether or not the attribute value was present and would also be able to then possibly corrupt that information. That's the only one that comes to mind right now, Your Honor. I do want to touch briefly on a couple of things. What's an abstract idea? Is an abstract idea an idea or something in the mind? And that's where the idea of mental steps comes from. Right. I think that's a fair general description. Sometimes these are implemented manually, like opening a filing cabinet. I think the abstract idea is something like you described and is in contrast to a concrete system. And I think that's what we have here. These claims are very specific in the types of hardware that are present and the algorithms that are used. And I think we then have what's deemed to be a special purpose computer for purposes of the Federal Circuit's precedent on the distinction between special purpose computer versus general computer. These claims are not implemented on a general purpose computer. We provide a very specific algorithm. That algorithm is in the claims. And it is enough to distinguish our patent from the patents that are found to be non-patentable because they implement an abstract idea on a general purpose computer. We don't have a general purpose computer here. In fact, the district court even concluded that we met the machine transformation test as a result of that. Of course, we've had a number of one-on-one cases in which you could make the same contention. In fact, people have unsuccessfully where you've had a computer which has been transformed, if you will, as per your argument, into a specific designated, dedicated computer by virtue of the programming that's been done to it. But nonetheless, the court has said, well, this is still an abstract idea. And one could say the same thing, I guess, about Alice. Well, Your Honor, I think that you're right. Of course, many people have tried this because it is outcome determinative, I believe, in this particular case. But I mean Alice itself had a computer which had been programmed to perform a very specific test. Why isn't that a specific, non-general computer? I think the difference between our case and Alice, for example, is the specificity that's provided in our claims. Our claims spell out a very detailed set of algorithms that the process goes through in order to decide whether or not to allow access to a particular resource. Does specificity get away from abstractness? Yes. That's, I think, you've put it perfectly, Your Honor. That is my point. But controversial is the case, for example, in which there were a number of steps which were laid out, I think seven or eight steps, if I recall correctly. Yes. You're probably more familiar with it than I am. But in that case, the court nonetheless said multiple steps do not rescue you from abstraction. Yes. I think that the difference between this case and Ultra-Marshall is really the specificity again. If you look at what the steps were in the Ultra-Marshall case, there were things like identifying a person who wants access to content. It doesn't tell you how to do it, how to implement it. That's exactly the opposite of what we have here. Our claims tell you in precise detail, step by step, what the computer does. And it doesn't just say you should figure out whether or not this person should be granted access and use a computer to figure it out. It says first do step one, two, three, four, five with very specific detail, not using really functional language. It's very precise in what it requires. The court here said looked at the claim and found a lot of technical jargon in the claims. And it kind of stripped that out and said that upon closer examination, the gist of the claim. Is there a problem with the district court looking to whether claims are directed to an abstract idea by trying to determine what the core, the gist, or the heart of a claim is? Well, look, I think I don't want to get too caught up in the terminology. I know we did take the district court on for looking for what is described as the heart of the claim. I think that the precedent suggests that that's inappropriate. But the bottom line is what the district court actually did is really the problem. And the district court took these very precise claims and boiled them down to people who meet certain characteristics are entitled to do certain things. That is completely divorced from the entire purpose of this invention. Is that because that's too simplistic? That's one of the results of the claim, but that's not the only one? I think the main problem with that is it completely ignores the entire point of this patent. As I started off by saying in this oral argument, the patent is clearly directed to solving problems in prior art computer-based access control systems. That's what this patent is about. And to boil this patent down to people who meet certain requirements are entitled to do certain things completely ignores what motivated the inventors to come up with this invention and the entire purpose of this patent. Well, why is that? Because that's not the abstract idea that the claims are directed to? That's right. What are the claims directed to? If you were to say they're directed to an abstract idea, what would that be? And then what are the limitations in the claim that begin to remove you from running a fallacious step one of Alice? I think that – first of all, of course, I don't believe there's an abstract idea. But if I was trying to sort of summarize what the claims of the patent cover, I would say that they are – cover attempts to solve problems associated with computer-based access control systems by using what we describe as a dynamic enrichment process to avoid problems related to bandwidth, processing power, and security. Dynamic enrichment process? Is that your characterization? Yes, Your Honor. And that constitutes – as specifically as you can identify, what constitutes the dynamic enrichment process? Your Honor, I mean I could try to summarize it briefly in words, but I think – Yeah, I would like you to summarize it in words because that's what I'm looking for. Sure. Let me start by saying that's depicted in figure four of the patent, which is entitled dynamic enrichment process. But what that generally describes is receiving a request to do something to a resource, then determining a rule for whether or not that access should be granted. Once you've obtained the rule, you determine what information is required to assess that rule. Once you have the list of required attributes, you determine whether or not you have those attributes already available at the server. If you don't have those attributes already available at the server, you make a series of connector requests based upon which connectors have which information, receive the information back from the connectors, and then evaluate the rule based on the information retrieved from the connectors and return a decision about whether or not access should be granted. Would you agree that if you set aside those limitations that deal with the connectors and the non-server databases that may contain attributes or rule segments, that this claim would fail? If we set aside – I'm sorry, I just wanted to make sure I had the question right here. Well, you've emphasized throughout the argument and in your brief the portions of the claim that deal with the distributed aspect of this access system. That is to say the connectors to the non-server databases for purposes of attributes and rule. If you take those out and you simply say everything resides in the server, is there still a patentable invention in this case? You know, that's a tough one for me to answer, Your Honor, because it's so divorced from the entire purpose of this invention. Well, it's a good starting point for my way of thinking about this case because I want to know whether – how much you're relying on those distributed aspects of the claim to get you out from under 101. Well, I think that those are important aspects for getting us out from under 101 in part because it makes it something that can't really be done by hand or by the human mind. Can you think of a reason – let me put it this way – can you think of a reason that the claim that I described without the distributed aspects would survive 101 analysis? I think that would really depend on how specific the rest of the method was described. If it was still a concrete idea – Taking those limitations out of your claim. But those are, admittedly, the most concrete and specific limitations, what we call sort of the heart of the dynamic enrichment process. If you were to strip those out from under our claim, I can't, sitting here right now, tell you that I have another basis I could identify that would make this patentable. I see I'm past my time, Your Honor. You've consumed your time, but we'll give you two minutes back for rebuttal. Thank you, Your Honor. Mr. Bell. Thank you, Your Honor. Judge Lori, may it please the court. I'd like to pick up where the court left off with my friend in two respects. Number one, they very clearly, both in the district court and in this court, argued that it's inappropriate to look to the heart of the claims. And that's just flatly incorrect under this court's case law. This court has done it again and again. In the Ultramershal case, where there are 11 steps. In Accenture, where there are numerous components, numerous steps, including, I might add, components almost identical to the ones we have here. So are you saying that when the court says, I'm looking at the gist of the claims, that that was error? No, that was absolutely correct. That that's correct? That's absolutely correct. In Ultramershal, this court actually – Can you say the heart of the claims? Can the district court look and try to discern what the heart of the claims is? Not only can it, it must, under this court's decisions in Ultramershal. What's it doing? Why would the court do that? Is it trying to find whether the claims are directed to an abstract idea? Exactly. So at that point, the court says, in order for me to answer that question, I must discern what the heart of the patent is or the claim is? That's exactly right. That's what the Supreme Court did in Alice. That's what this court did in Accenture, Ultramershal, Internet Patents Corporation, and a host of other cases since Alice. It takes a look at the claim. What's the heart of a claim? I mean, what are the attributes of a heart or a gist of a claim? Well, I think I would direct the court back to the claim in this case. I think that's where, as Judge Lori mentioned, that's where we should start. And so looking at this – But isn't that a problem? Because everything boils down to an abstract idea at some point. At some level, yes. So at all levels, then, the heart of every claim is abstract. I disagree, Your Honor. I think you can look at some claims, including ones the Supreme Court has addressed, for example, in the Myriad case, in other cases where there was no suggestion that there was an abstraction involved in those cases. So when you're looking, however, at something that can be done mentally, and I think it's very clear when you look at the steps here, they're claimed contrary to my friend's suggestion, not with any specificity, but at a very broad level. If you look at what the steps are here, they boil down to five, basically. First, receive the request for access. Second, consult the rule for access. Third, determine what information you need to evaluate the rule. Fourth, go out and get whatever information you don't already have. And fifth, apply the rule to the information and make the access decision. That's exactly what anyone entering a secure building, for example, has to go through. That's what I went through today coming in the security line. The officers take a look at the rule, the rule being during normal business hours, visitors may enter with a proper ID and without having anything in their bags, and they evaluate that. What's the limit of this 101 ineligibility issue for abstract ideas? If we have a good idea that achieves certain benefits and advantages, are none of these protectable by patents? Well, in BISAFE, this court said that even if ideas are groundbreaking, brilliant, they still, if they're abstract, don't qualify under the patent laws. Well, all ideas are abstract. I mean, ideas, I keep on using the word. An abstraction, an abstract idea is an idea. Agreed. An idea is something that one conceives mentally. One can write it down, but it's basically mental, isn't it? The idea in DDR was an idea, but it was deemed to be a patentable idea because it was not, as the court concluded, abstract. So what is the line? I'm asking the same question, really, as Judge Lurie. In terms of thinking about, say, ultra-mercial versus DDR, what is the line that you think distinguishes abstract ideas from non-abstract ideas as viewed through that lens? Sure, and first I would want to point out, I take – I disagree with the premise of the question in the following respect. DDR, I don't believe, held there was no abstract idea. Rather, what it said is under any of the formulations. It found that it was patentable. It did ultimately find that it was patentable. I'll take your point, and let's say, what do you think is the 101 distinction between a DDR-type case and a case such as ultra-mercial? Sure, and I'll point to what the court in this court did in DDR specifically. First, it looked at whether the claims, as provided, had real-world analog. It looked for a brick-and-mortar analog, and in that case it didn't find one because the claims were directed at the problem of being instantaneously transported from one location to another location on the internet. That didn't occur outside the internet. Brick-and-mortar in what terms? In that it deals with internet or infrastructure? Brick-and-mortar. Electronic brick-and-mortar? The court looked for a brick-and-mortar analog to connect it to common human experience. So, for example, in this case, the common human experience is going through a security checkpoint. Are we talking about implementation of an idea? When we implement an idea, we're doing something physical. We're transforming. The Supreme Court says machine transformation is a clue. I think it meant more than just a clue. Well, to your question about the machine or transformation test, I think what you're getting at is, okay, let's accept that there's an abstract idea here, and let's look if there's enough in these claims to transform the nature of the claim into a patent-eligible invention. You say transform. In other words, implement. Exactly. Implement it in a specific enough fashion or an inventive enough fashion is what the Supreme Court said. And although the machine or transformation test provides a clue, the Supreme Court in Mayo said that that doesn't trump the two-step Alice analysis. And, in fact, in Alice itself, it never mentioned the machine or transformation test. So while it may be a clue in some situations, it's certainly inconsistently looked to. I'm not sure I'm satisfied with your – maybe you hadn't finished your discussion of DDR, but I'm not sure that the brick-and-mortar analog is the end of the story as to why DDR is different from ultra-martial. Thank you, Your Honor. There are two ways. I mean I can think, for example, in the DDR situation of a brick-and-mortar analog. I have a store, and somebody comes in and says, I'm interested in thus and such. And I say, well, I know there's another store down the street where they have that. I don't happen to have it. But I don't want you to go down there. Here's their catalog. I happen to have their catalog right here along with the other catalogs of all related stores. So why don't you stay here and just look at the catalog? That's a brick-and-mortar analog. It is, and the court actually considered that specific analog and decided it wasn't like the claims in the following respect because the claims prevented you from being instantaneously transported to a completely different location. And it talked about that situation as still being in the store that you were originally. So it didn't provide a close enough analog. So that's the first reason that DDR is different. Well, in DDR, it turned out that what's happening is that the claims were directed to changing and creating a certain web page, correct? And that's an internet-specific problem, one that didn't exist before the advent of the internet. In this situation, we're looking at a security system that provides access to databases and essentially protects the data, the privacy data of millions and millions of people at one single time. Isn't that directed to a specific problem on the internet? I mean, we didn't have this privacy data, the target and the federal government disclosures, the hacking. None of that existed before the computer. This patent appears to be directed towards those type of problems. Isn't that specific, similar to DDR? No, Your Honor, and first I would point out that none of those characteristics that you just mentioned and that my friend has relied on are actually in the claims. When you look at the claims, the claims boil down to a very simple set of steps for achieving access control, the same steps that you would apply in the real world. And so for that reason alone, DDR has no applicability. And I would turn to the intellectual ventures case that this court decided last year where it reached the same conclusion. There you had claims for customizing internet web pages by taking user data, user browsing history, combining it, customizing it, and creating a brand new web page, something that was purportedly never done before in that case either. And the court realized that there was a real world analog there and said therefore DDR doesn't apply. So we know DDR only applies if there isn't a real world analog. So that's one reason this is different. But DDR goes on to have additional requirements. It must also, in that case, it changed the internet in a fundamental way, in a way that hadn't been done before. So it wasn't just changing something done on the internet or on a computer as is done here, but it was actually changing the internet or changing the computer itself. And so that provides another very clear distinction from DDR. I'm sorry. I didn't want to cut you off. Go ahead. No. Well, address, if you would, the argument that your opposing counsel spent most of his time on this morning, which is the parking, if you will, of the attributes or the rules in non-server databases as a distinction between this and the stripped down version of this invention. Certainly. Or could there be simply a bare bones access-based, or rather attribute-based access system? Certainly. Two responses in common. First of all, that is just a commonplace outgrowth of the abstract idea itself. You can imagine somebody in the suit. How do we know that? I think you turn to the common experience that the court looked to in content extraction, it looked to in intellectual ventures, just common human experience. It may be in common in your human experience, but it's not common in mine of knowing that an obvious and everyday phenomenon is parking attributes and rules somewhere else. I mean, why is that just so common? Well, consider the common example of somebody arriving at the boss's workplace and saying, I would like to see the boss. The secretary or assistant calls the boss and says, are you seeing visitors today? And the boss might say, only family members. So there's the rule. The assistant has retrieved the rule. Now the assistant is going to apply the rule to decide whether to give the person access. So there are many other examples exactly like that one. And I would point also, number two, more specifically to this court's decision in Accenture. There, you had specific components organized in a specific way that I submit are indistinguishable from the way the server is organized here. In that case, there was a server. There was a separate database. It was called a task library database that held the rules separate from the server. The server, when it received information from the user, which was also separate, would then go retrieve the rule from the task library database, apply the rule to the characteristics of the information, that's what this court said, and then generate output back to the user. So I submit that that is no different from what we have here. It sounds like 102, 103, not 101. Well, Accenture was a 101 case. I know, but you're using it. But the aspect of Accenture that talks about distributing as showing that this is in the prior art, as I understand what you're saying now, I mean, I don't know why that isn't more of a 102, 103 argument than a 101 argument. Let me clarify, if I could, Your Honor. The way Accenture addressed those components in that case was under the rubric of whether they were just generic computer components performing generic computer functions. Right. And so those are the exact same functions. I see. So you're saying those functions are – Accenture has defined those functions, in fact, as generic computer functions for purposes of any kind of computer-implemented invention. Precisely, Your Honor. And that's exactly – if you look at all the things that they're relying on, every single one falls under that same rubric as general components performing general computer functions, things that the Supreme Court has repeatedly, particularly in Alice, found non-inventive, not enough to add an inventive concept. And this Court, in a dozen cases since Alice, has held the exact same thing, the exact same type of components, the exact same type of ideas. If there are no further questions. Thank you. Mr. Bell, Mr. Fee has a few minutes for rebuttal. Thank you, Your Honors. I'd like to try to squeeze in three quick points, if I may. The first is, I think Judge Bryson asked a very important question about how do we know that these things are supposedly commonplace ideas. This was decided on a motion for judgment on the pleadings. Although the Court has granted motions based on 101 before summary judgment and discovery, those cases generally find the basis for the assertion that something is well-known or commonly established in the patent itself or the patent prosecution history. There's no support for the notion that it was commonplace for access control systems to store some of the information regarding rules and attributes away from the server. And for that reason, I think reversal is appropriate. Does it matter in this case whether or not the Court did not construe any of the claims, any of the terms of the claims? Well, I think that depends in part on some of the arguments that whether or not we take some of the arguments from the other side as the basis for granting a 101 motion. We identified, I think, a couple terms in our briefs that if, for example, they were going to argue that the order of the steps did not matter, that that's a claim construction issue that I think would have to be made before you could assess 101 if you're going to assume that the order of the steps don't matter in this case. One quick point I want to make about the abstract idea and how abstract is too abstract. I want to really focus the Court on page 31 of Axiomatic's brief. It says that the heart of Jericho's claims, quote, this is a quote, making access decisions based on user attributes is precisely the computer activity that this Court found non-inventive and ultra-martial. Well, if we're stripping the claims of so much meaning that patents directed at solving problems in attribute-based security systems are at the same abstract idea as using advertising as a form of currency on the Internet, then we have really stripped these claims of any real meaning. That's going far too far under any precedent in this case or from the Supreme Court. One last point I want to make real quickly if I'm out of time. One quick point. Sure. I just want to make sure that we also focus on the fact that Step 1 and Step 2 of the Alice test work together. So if the abstract idea that the district court identified, which is people meeting certain requirements are allowed to do certain things, is the abstract idea we're talking about, then we need to be asking in Step 2, is this a drafting attempt to obtain a monopoly on that abstract idea? And the other side has never wanted to talk about whether or not there's a preemption problem with that because there is no credible argument that our patent will preempt that abstract idea that persons who have certain characteristics can do certain things. Thank you, Mr. P. Thank you, Your Honor. It certainly was not an abstract argument. We'll take the case under advisement.